UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Deborah Harmon.,

    Plaintiff,

v.                                                          Case No. 1:03cv169

Lonnie L. Grizzel, *et al.*,                         Judge Michael H. Watson

    Defendants.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon Defendant City of Cincinnati's Motion for Summary Judgment. (Doc. 41) Plaintiff Deborah Harmon has filed a Response in Opposition (Doc. 44) and the City has filed a Reply. (Doc. 45) The Court also held oral argument on the Motion during the Final Pretrial Conference held on April 19, 2004. This matter is ripe for review. For the reasons stated herein, Defendant's Motion for Summary Judgment is GRANTED.

**I.    PROCEDURAL AND FACTUAL BACKGROUND**

In her Amended Complaint, Harmon brings a claim of violation of her substantive due process under 42 U.S.C. § 1983, as well as state law claims of assault and battery, and intentional infliction of emotional distress. (Doc. 21) However, in her response to the motion, Harmon concedes that under Chapter 2744 of the Ohio Revised Code, the City is immune from liability for Harmon's state law claims. A clerk's entry of default has been entered against Defendant Lonnie Grizzel. (Doc. 31) Therefore, the only remaining claim

is Harmon's section 1983 claim against the City.

In 2001, Harmon first met Lonnie Grizzel through her then boyfriend, Dave Bailey. (Doc. 41, Ex. 2, Harmon Depo. at 15) At the time, Grizzel was a police officer in the Cincinnati Police Department. (Id. at 15) Bailey was a Lieutenant in the Department and was also Grizzel's supervisor. (Id. at 15, 49) Harmon was working as a criminal bailiff for Judge Nadine Allen. (Id. at 21)

Harmon first met Grizzel at a Christmas party at Bailey's house. (Id. 16) During the party, Grizzel tried to kiss Harmon and was flirting heavily with her. (Id. at 19, 20) Harmon told Bailey about it, and Bailey told her, "oh, it's because he's drunk, he's stupid." (Id. at 20) Harmon then left the party early because Bailey was flirting with someone else. (Id. at 20)

Harmon explained that she would see Grizzel when he would come into the courtroom where she was working, would fly past her and Bailey in his car when he was out, or he would stop by Bailey's house. (Id. at 22) Harmon explained that it seemed as if Grizzel would show up everywhere Bailey was. (Id. at 28) Harmon stated that she would be out drinking with Bailey on a date, and Grizzel would show up. (Id. at 2728) Harmon stated that Bailey and Grizzel were "drinking partners" and it was pretty much a "drunk fiasco all the time." (Id. at 23) Harmon stated that it seemed like Grizzel and Bailey would drink almost every day when they would get off work. (Id. at 24) Harmon stated that Grizzel and Bailey would talk about how much they hated the Cincinnati Police Department. (Id. at 23)

Harmon told Bailey that she did not like Grizzel because he "seemed real sneaky about stuff" based on the way he talked about the Police Department. (Id. at 28) Harmon

also told Bailey that she did not think that Grizzel should be a police officer because of the way he talked about race. (Id. at 29) Harmon expected Bailey to do something about it. (Id. at 30) Bailey explained to Harmon that Grizzel has had family problems. (Id.) Bailey also told Harmon certain stories about Grizzel. (Id.) For instance, when Bailey was Grizzel's sergeant or lieutenant, Grizzel tried to run a girl off the road because Grizzel thought she was cute and wanted her phone number. (Id.) On another occasion, Grizzel sexually assaulted the daughter of a retired lieutenant colonel chief on a night where Grizzel and Bailey had been out together. (Id. at 31-33) Harmon asked Bailey why nothing was done about this incident, and Bailey replied that "we've been keeping it quiet." (Id. at 33) Harmon responded by telling Bailey that he was "too much friends with these people you can't do your job when you hear stuff you know to do your job, you can't be friends, real personal friends like that and not be their supervisor at the same time." (Id.) Bailey also told Harmon that Grizzel had been accused of rape in high school and when Grizzel was in the military. (Id. at 35-36) Bailey told Harmon that Grizzel was "actually crazy." (Id. at 37)

On June 9, 2002, Harmon went to Bailey's house to surprise him and possibly spend the day with him. (Id. at 40) However, Bailey was not at home. (Id.) Harmon went to a restaurant near Bailey's house to wait for him. (Id. at 41) Harmon ate lunch and had two margaritas. (Id.) Harmon received a page from Victor Spellen, a Cincinnati police officer who she knew from when she worked at the Hamilton County Justice Center. (Id. at 42) Spellen told Harmon that he was going to call some other people and try to have them come to the restaurant. (Id. at 43) Ten to twenty minutes later, Harmon received another page. (Id. at 47) When she called the number, it was Grizzel. (Id.) Grizzel told Harmon

3

that Spellen had given him her pager number. (Id. at 47-48) Grizzel told Harmon that he wanted to talk to her about something, but did not want to talk to her about it over the phone. (Id. at 48) Harmon assumed it was about Bailey because that was the only thing that Harmon and Grizzel had in common. (Id.) Harmon thought Bailey was cheating on her because he had been "blowing her off" and had been flirting with a girl that worked under him. (Id. at 50, 56-57) Harmon thought that Grizzel might have pictures of Bailey cheating on her with another girl. (Id. at 56) Harmon asked if she should meet him in his district because Grizzel was working that day. (Id. at 50) Grizzel did not want to meet Harmon in his district, and told her to meet him at Eden Park. (Id. at 49-50)

When Grizzel arrived at the park, Harmon was talking to a man with a German Shepard. (Id. at 51) Grizzel was driving a police cruiser. (Id.) Grizzel told Harmon to follow him and drove off. (Id. at 52) Harmon states that she followed Grizzel out of respect for Grizzel as an officer. (Id.) Harmon did not want to disrespect a police officer in front of a civilian. (Id. at 54) Grizzel pulled into a parking building near the park. (Id. at 55) Grizzel instructed Harmon to get into his police cruiser, but Harmon refused and told Grizzel that they could either talk outside, or Grizzel could get into her car. (Id. at 56) Grizzel got into Harmon's car and sat in the passenger's seat. (Id.) Harmon asked Grizzel what it was that he wanted to tell her or show her. (Id.) Grizzel looked to his right and left, and said, "it's not what I have to tell you, it's what I want to show you." Grizzel then grabbed Harmon's right nipple. (Id. at 57) Harmon pushed Grizzel's arm away and noticed that Grizzel was holding his penis in his right hand. (Id. at 58) Grizzel "pulled on himself three times" and ejaculated on himself and Harmon's car. (Id. at 57) Harmon asked Grizzel what he was doing, and he replied, "I don't know" in a stupid voice. (Id. at 59)

4

Harmon told Grizzel that she thought he was a "freak." (Id.) Grizzel was leaning over in the car as if he was embarrassed. (Id. at 62) Harmon felt threatened because Grizzel had a gun and was acting weird. (Id. at 62-63, 66) Harmon did not know if Grizzel was going to handcuff her and put his gun to her head. (Id. at 66) However, while Grizzel's right arm did come up towards his gun area at one point, Harmon stated that he could have just been "pulling it up;" and Grizzel did not motion for his handcuffs. (Id. at 66-67)

Grizzel asked Harmon if she had any napkins. (Id. at 63) When Harmon replied no, Grizzel told her to get some from the front seat of his cruiser. (Id.) Harmon got the napkins, and Grizzel used the napkins and threw them on the floor of Harmon's car. (Id. at 63, 67) Harmon told Grizzel to get his "crap out of my floor" and Grizzel picked up the napkins and threw them out of the car. (Id. at 67-68) Grizzel then said that he had to get back to work and left. (Id. at 64)

Harmon then drove around awhile thinking about what had happened. (Id. at 68) Harmon thought that Bailey might be involved in order to see if Harmon was cheating on him. (Id.) Harmon decided to go back to get the napkins. (Id. at 68) Harmon wanted to give them to Bailey for DNA testing, which would prove to him "what kind of weird friend he had." (Id. at 72) Harmon drove to Bailey's house. (Id. at 69) Bailey was now home, and Harmon told him "to go down and get his friend's DNA shit . . . out of my car." (Id.) Bailey was confused, and Harmon told him the whole story. (Id.) Bailey did not know if he believed the story, and said that he needed to talk to Grizzel. (Id.) Bailey did take the napkins from the car. (Id. at 71) Harmon did not report the incident to the Police Department because Bailey told her that he would "take care of it." (Id. at 73)

After the incident on June 9th, Grizzel appeared in the courtroom where Harmon

5

was working. (Id. at 24, 26) Grizzel yelled, "I'm so drunk." (Id.) Grizzel would also come into the courtroom and page Harmon. (Id. at 26) Harmon told Bailey, and Bailey told her that he would take care of it. (Id.)

During a Fourth of July party at Bailey's house, Grizzel learned from other police officers that Bailey was getting drunk every other night and telling everyone in the bar about the June 9th incident. (Id. at 77) Harmon reported the incident to the Police Department about a month later. (Id. at 25, 87) Harmon tried to keep Bailey out of it because "he said he was trying to become a captain and if he was caught up in the middle of this mess and they found out that he knew prior, then he wouldn't become a captain." (Id. at 98) Bailey told Harmon not to tell the Police Department that Grizzel grabbed her nipple because that would be a felony charge, and if the Department found out that Bailey knew about the incident, then he was "going to jail too." (Id. at 99)

The Internal Investigations Section of the Cincinnati Police investigated the June 9th incident. (Doc. 41, Ex. C) The allegations brought by Harmon were sustained. (Id.) As a result of the investigation, Grizzel was charged with and convicted of public indecency. (Id.) Grizzel was terminated from the Police Department on February 14, 2003. (Doc. 41, Janke Aff. ¶12)

## II. ARGUMENTS OF THE PARTIES

The City argues that Grizzel was not acting under the color of law because he was pursing purely personal, private pleasure, without official purpose and without exercising his police authority. The City maintains that there is no municipal liability, because even if Grizzel was acting under the color of law, there was no constitutional violation. The City states that there is no evidence of a failure to train or a failure to supervise.

6

Harmon responds that it is not disputed that there was a personal gratification component to Grizzel's conduct, but points out that Grizzel was in uniform, driving a police car, and Harmon followed him out of respect for officer authority. Harmon argues that because Grizzel used his position as a police officer to facilitate his sexual assault, he was acting under the color of law. Harmon argues that this sexual assault constitutes a constitutional violation, and this violation occurred as a result of the City's failure to train and supervise Grizzel.

### III. ANALYSIS

    A.    <u>The Summary Judgment Standard</u>.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The mere existence of a scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the non-moving party. *Id.* at 252.

    B.    <u>Section 1983</u>.

Section 1983 creates no substantive rights, but merely provides remedies for

deprivations of rights established elsewhere. *Tuttle v. Oklahoma City*, 471 U.S. 808 (1985). Section 1983 has two basic requirements: (1) state action that (2) deprived an individual of federal statutory or constitutional rights. *Flint v. Kentucky Dept. of Corrections*, 270 F.3d 340, 351 (6th Cir. 2001), *citing*, *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir.1998) *and United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 33 (6th Cir.1992).[1]

Harmon claims that Grizzel's actions violated her substantive due process rights. While Harmon may have a Constitutional right to personal security and bodily integrity, *see Doe v. Claiborne County*, 103 F.3d 495, 506 (6th Cir. 1996) (holding that sexual abuse violated substantive due process right to personal security and bodily integrity), the Court finds that Grizzel's actions were not taken under color of state law.

A public official has acted under color of state law when he has "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " *West v. Atkins*, 487 U.S. 42, 49 (1988), *quoting*, *United States v. Classic*, 313 US. 299, 326. (1941). "Section 1983 is generally not implicated unless a state actor's conduct occurs in the course of performing an actual or apparent duty

---

[1] 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

8

of his office, or unless the conduct is such that the actor could not have behaved as he did without the authority of his office." *Waters v. City of Morristown, Tenn.*, 242 F.3d 353, 359 (6th Cir. 2001), *citing*, *West*, 487 U.S. at 49-50.  Therefore, not every action undertaken by a person who happens to be a state actor is attributable to the state. *Id.*  As the Sixth Circuit has explained:

> . . . a defendant's private conduct, outside the course or scope of his duties and unaided by any indicia of actual or ostensible state authority, is not conduct occurring under color of state law. *See McNeese v. Vandercook*, 173 F.3d 429, 1999 WL 133266, *2 (6th Cir. 1999) (unpublished table decision) (holding that a deputy sheriff who struck a fellow deputy did not act under color of state law); *Mooneyhan v. Hawkins*, 129 F.3d 1264, 1997 WL 685423, *4 (6th Cir. 1997) (unpublished table decision) (holding that a police officer did not act under color of state law when he took advantage of his friendship with the plaintiff, not his authority as a police officer, to rape her); *D.T. by M.T. v. Indep. Sch. Dist. No. 16*, 894 F.2d 1176, 1188 (10th Cir. 1990) (holding that a teacher who molested three students at a basketball camp during summer vacation had not acted under color of state law).

*Id.*  Instead, the conduct allegedly causing the deprivation of a constitutional law must be "fairly attributable" to the state.  *Id.*, *quoting*, *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).

In determining whether a police officer acted under color of state law, the Sixth Circuit has explained:

> The fact that a police officer is on or off duty, or in or out of uniform is not controlling.  "It is the nature of the act performed, not the clothing of the actor or even the status of being on duty, or off duty, which determines whether the officer has acted under color of law." *Johnson v. Hackett*, 284 F.Supp. 933, 937 (E.D. Pa. 1968).

*Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir.1975).  Accordingly, "[a]cts of police officers in the ambit of their personal, private pursuits fall outside of 42 U.S.C. § 1983." *Id.*, *citing*, *Monroe v. Pape*, 365 U.S. 167 (1961).  Only where an officer purports to exercise official

9

authority does he or she act under color of state law. *See Mooneyhan v. Hawkins*, 1997 WL 685423 *4 (6th Cir. 1997) (unpublished decision).

In *Mooneyhan*, the Sixth Circuit recognized that such manifestations of official authority included flashing a badge, identifying oneself as an officer, placing an individual under arrest, or intervening in a dispute between third parties pursuant to a duty imposed by police department regulations. *Id.* The court cited several examples where state action was found because the officer either engaged in official conduct, purported to be engaged in official conduct, and/or used a weapon issued to the officer by the law enforcement agency:

> *Layne v. Sampley*, 627 F.2d 12, 13 (6th Cir. 1980) (officer acted under color of state law where he had authority under law to carry weapon, argument between plaintiff and officer arose as a result of officer's performance of his official duties on a prior occasion, and threats made to officer by plaintiff communicated to officer through police agency); *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975) (officer acted under color of state law where he intervened in an altercation, used his department-issued mace and handgun, and attempted to arrest those individuals involved in altercation); *Pickrel v. City of Springfield*, 45 F.3d 1115, 1118-117 (7th Cir. 1995) (officer acted under color of state law where he served as a private security guard at a McDonald's restaurant wearing his police uniform and badge, and arrested plaintiffs); *United States v. Tarpley*, 945 F.2d 806, 809 (5th Cir. 1991) (Sheriffs deputy acted under color of state law where he beat his wife's former lover while telling victim that he had special authority as a Sheriffs deputy to do so, told victim he could shoot him because he was a Sheriff, deputy, and he summoned other police officers to the scene to follow the victim to the edge of town), *cert. denied*, 504 U.S. 917 (1992).

*Id.* The court also cited examples of where the officer's purely private acts which were not furthered by any actual or purported state authority, and were found not to be acts under color of state law:

> *Delcambre v. Delcambre*, 635 F.2d 407, 408 (5th Cir. 1981) (holding that alleged assault by on-duty police chief at police station did not occur under color of state law because altercation with plaintiff, defendant's sister-in-law,

> arose out of a personal dispute and defendant neither arrested nor threatened to arrest the plaintiff); *Hunte v. Darby Borough*, 897 F.Supp. 839, 841-42 (E.D.Pa. 1995) (holding that an off-duty police officer's intervention in an altercation was not under color of state law because the officer was not in uniform, did not display badge, did not identify himself as a police oicer and did not attempt to arrest anyone).

*Id.* In the case before it, the Court held that the officer was not acting under color of law when he raped the plaintiff. *Id.* The court stated that the facts demonstrated that the officer was pursuing his purely personal, private interests. *Id.* at *5. The court noted that the officer was off-duty, dressed in casual clothes, driving his own truck. *Id.* The court found that at no time did the officer exercise or purport to exercise any authority as a police officer, and instead, took advantage of an obviously intoxicated woman, who trusted him as a friend, and who was not in the frame of mind to make the decision to go to his apartment. *Id.*

In *Neuens v. City of Columbus*, 275 F.Supp.2d 894, 900 (S.D. Ohio 2003), this Court relied on *Mooneyhan* to determine whether an off-duty officer was acting under color of state law when he was involved in an incident in a restaurant where one of his friends assaulted the plaintiff. This Court concluded that the officer was not acting under color of law at the time of the incident giving rise to the plaintiff's claims. *Id.* at 901. This Court noted:

> Throughout the event, Defendant Bridges never told anyone he was a police officer. He did not give any non-verbal indication that he was a police officer, as he was out of uniform and never displayed either his badge or his police-issued gun. He did not engage in affirmative conduct to prevent the incident before it began. After the incident, he neither arrested nor charged his friends with any crimes, nor reported the incident to on-duty police officers.

*Id.* The Court found that whether the defendant "had been a police officer or not, he would

11

have been in the same position, and probably would have acted just as he did." *Id.*

In the present case, Harmon argues that Grizzel was acting under color of law because (1) he was on-duty, in uniform, and in a city police car; (2) Harmon followed Grizzel on the day of the incident out of respect for officer authority; and (3) Grizzel had a gun and handcuffs. The Court finds that this is insufficient evidence that Grizzel was engaged in official conduct. The fact that a police officer is on or off duty, or in or out of uniform is not controlling. *See Stengel v. Belcher*, 522 F.2d at 441. While Harmon stated that she followed Grizzel of out respect for officer authority, she also explained that she did not want to show disrespect to a police officer in front of a civilian. This is not a clear indication that Grizzel was purporting to exercise any authority as a police officer. Moreover, Harmon's overriding reason for following Grizzel, and for meeting him in the park in the first place, was to find out whether Bailey was cheating on her. Finally, while Grizzel may have had a gun and handcuffs on his person during the incident, at no time did he threaten Harmon with their use. "[T]he test for whether an officer acted under color of state law is not what the victim knew about the officer at the time of the incident, but rather what actions did the officer take to assert his authority under color of state law." *Mooneyhan*, 1997 WL 685423, at *5, *citing*, *West v. Atkins*, 487 U.S. 42, 49 (1988).

The Court concludes that Grizzel's actions are in the ambit of his personal, private pursuits. Grizzel used his personal relationship with Bailey to first lure Harmon to the park and then later lure her to the parking lot. Grizzel was not performing an actual or apparent duty of his office: he had left his district and was not conducting police business. Nor was Grizzel's conduct such that he could not have behaved as he did without the authority of his office. Grizzel used his personal knowledge of Bailey and the promise of information

about Bailey to have Harmon meet and follow him.  Clearly, Grizzel's inappropriate sexual acts once inside Harmon's car were purely private conduct.  The Court finds Grizzel's behavior completely deplorable, but in the absence of state action, Harmon cannot maintain her section 1983 claim against the City.

Moreover, even if Harmon was able to establish a section 1983 claim, she would be unable to hold the City liable.  For liability against the City to attach, Harmon must offer proof of a wrongful or injurious policy or custom on the part of the City and a causal link between the policy or custom and her constitutional deprivation.  *City of Canton v. Harris*, 489 U.S. 378, 385-86 (1989).  A municipality cannot be sued on a *respondeat superior* basis.  *Monell v. Department of Social Servs.*, 436 U.S. 658, 691 (1978).  The municipality can only be liable if its policy or custom played a part in the alleged violation.  *Berry v. Detroit*, 25 F.3d 1342, 1345 (6th Cir.), *cert. denied*, 115 S. Ct. 902 (1994).  A plaintiff must show that the city's policy, or lack of policy, was a "moving force" in the deprivation of the plaintiff's rights and arose from "deliberate indifference" to the plaintiff's rights. *Doe v. Claibome County, Tennessee*, 103 F.3d 495, 508 (6th Cir. 1996).  As this Court has explained: "To show the existence of an offending custom or policy, plaintiffs must adduce specific facts supporting their claim; conclusory allegations are insufficient." *Games Galore of Ohio, Inc. v. Masminster*, 154 F.Supp.2d 1292, 1300 (S.D.Ohio 2001), *citing*, *Taylor v. Canton Police Dep't*, 544 F.Supp. 783 (N.D.Ohio 1982).

Harmon claims that in this case, municipal liability has been established based on the City's failure to train or supervise Grizzel.

The Supreme Court has held that inadequate training procedures "may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference

to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). To meet this deliberate indifference standard, the failure to train must reflect a deliberate or conscious choice made by the municipality. *Id.* at 389. Liability cannot be imposed unless "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390. The Sixth Circuit has held that a showing of deliberate indifference requires a showing of "something more culpable . . . than a negligent failure to recognize [a] high risk of harm." *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 912 (6th Cir. 1995), *quoting Black v. Indiana Area Sch. Dist.*, 985 F.2d 707, 712-13 (3rd Cir. 1993); *Stemler v. City of Florence*, 126 F.3d 856, 867 (6th Cir. 1997) (holding that a showing of simple or even heightened negligence will not suffice). It is only upon this showing of deliberate indifference that "the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *Harris*, 489 U.S. at 390.

Harmon points to evidence that allegations of sexual misconduct were made against Grizzel while he was a recruit for the police department. However, documents submitted by the City show that these allegations were investigated and found to be either "not sustained" or "unfounded." (Doc. 41, Janke Aff.) At most, the City's failure to give Grizzel special training or supervision after the allegations were made would constitute a negligent failure to recognize high risk of harm, but it does not amount to deliberate indifference.

Harmon also argues that the training recruits receive regarding sexual misconduct is inadequate. Regardless of the adequacy of the City's training program, the Court finds

14

it difficult to believe that the lack of training was a "moving force" in the deprivation of the Harmon's rights.  Grizzel did not need to be instructed that luring a female into a parking lot under false pretenses, getting into her car, grabbing her nipple without her consent and masturbating was inappropriate and potentially illegal.  Grizzel also points to the number of sexual complaints or harassment complaints filed against the City's police officers as evidence that the City's training program is inadequate.  (Doc. 44, Ex. 3 Schoch Depo. at 23) However, Ted Schoch, the former Director of the Police Academy, testified that without knowing the nature or the context of the complaints, he was unable to determine whether the forty-nine complaints over a six year period indicated a pattern.  (Id. at 36-37)  Because the City's training program on sexual misconduct, or lack thereof, did not play a part in the alleged constitutional violation, the City cannot be held liable.

On a final note, the Court finds it disturbing that through his friendship with Grizzel, Bailey knew of several incidents where Grizzel acted inappropriately.  However, there is no evidence in the record that Bailey relayed this information to anyone else in the Police Department, and in fact, it would appear that Bailey did what he could to keep the information from getting to anyone in the Police Department.

Based on the foregoing, the Court hereby orders that Defendant City of Cincinnati's Motion for Summary Judgment (Doc. 41) is **GRANTED** and the City be **DISMISSED** as a party.

**IT IS SO ORDERED.**

   /s/ Michael H. Watson
Michael H. Watson, Judge
United States District Court